[No. 30662.    Department ·Two.    March 7, 1949.]

THE STATE OF WASHINGTON, *Appellant,* v. JOHN A. HOUCK,
*Respondent.*[1]

[1]Reported in 203 P. (2d) 693.

*Lloyd Shorett* and *Max R. Nicolai,* for appellant.

*John J. Kennett,* for respondent.

SIMPSON, J.—The state of Washington appeals from an order sustaining a demurrer to an information and the entry of a judgment of dismissal. The information was worded as follows:

"He, the said JOHN A. HOUCK, in the County of King, State of Washington, on or about the 26th day of September, 1947, did then and there wilfully and unlawfully practice or attempt to practice medicine and surgery in this, that he, the said JOHN A. HOUCK, acting as physician and obstetrician, delivered a child born to Mrs. Elizabeth Hardin and performed services at such time, including the administration of ether and the cutting of the umbilical cord, without having at the time of so doing a valid, unrevoked certificate to practice medicine within the State of Washington and having at said time only a license from the State of Washington as a 'drugless healer' permitted to practice 'full sanipractic'; . . .

"He, the said JOHN A. HOUCK, as a part of the act or transaction alleged in Count I or a connected act or transaction, in the County of King, State of Washington, on or about the 26th day of September, 1947, did then and there wilfully and unlawfully practice or attempt to practice medicine and surgery in this, that he, the said JOHN A. HOUCK, administered a drug, the exact nature of which is unknown to the prosecuting attorney at this time, by hypodermic injection into the body of Mrs. Elizabeth Hardin,

without having at the time of so doing a valid, unrevoked certificate to practice medicine within the State of Washington, and having at said time only a license from the State of Washington as a 'drugless healer' permitted to practice 'full sanipractic'; . . ."

Assignment of error is "in sustaining respondent's demurrer and entering judgment of dismissal."

The charge was based upon Rem. Rev. Stat., § 10018 [P.P.C. § 734-31], which reads:

"Any person who shall practice or attempt to practice, or hold himself out as practicing medicine and surgery in this state, without having, at the time of so doing, a valid, unrevoked certificate as provided in this act, shall be guilty of a misdemeanor. . . ."

Our state constitution, Art. XX, § 2, provides:

"The legislature shall enact laws to regulate the practice of medicine and surgery, and the sale of drugs and medicines."

In order to implement the constitutional provision, the legislature has enacted several laws now contained in Rem. Rev. Stat., Title 68.

Respondent takes the position that the court was correct in sustaining the demurrer because the information failed to charge that an emergency did not exist at the time and place mentioned in the information. He bases his contention upon the provisions of Rem. Rev. Stat., § 10024 [P.P.C. § 734-43], which states in part: "Nothing in this act shall be construed to prohibit service in the case of emergency . . ."

This question has been presented to this court on various occasions. Our holding may be restated in the following language: Exceptions need not be negatived unless they are in the enacting clause of the law—that is to say, if the act defining a crime does not in itself define a defense or exception, it is not necessary to negative the exceptions or defense in charging the crime. *State v. Davis,* 43 Wash. 116, 86 Pac. 201; *State v. Seifert,* 65 Wash. 596, 118 Pac. 746; *State v. Bartow,* 95 Wash. 480, 164 Pac. 227; *State*

*v. Young,* 195 Wash. 515, 81 P. (2d) 799; *United States v. Cook,* 84 U. S. 168, 21 L. Ed. 538.

■ An examination of Rem. Rev. Stat., § 10018, does not reveal any exception in favor of a drugless healer acting in an emergency. That exception, as we have stated, is contained in Rem. Rev. Stat., § 10024. It follows that the exception set out in another statute need not be mentioned in the information, but advantage must be taken of it as a matter of defense.

Was it the intention of the legislature to make the practice of obstetrics outside the scope of practice given to drugless healers?

■ In construing a statute and ascertaining the legislative intent, certain rules are observed by the courts. The legislative intent must be gleaned from a consideration of the whole act by giving effect to the entire statute and every part thereof. *Linn v. Reid,* 114 Wash. 609, 196 Pac. 13; *State ex rel. Baisden v. Preston,* 151 Wash. 175, 275 Pac. 81; *Pease v. Stephens,* 173 Wash. 12, 21 P. (2d) 294; *Arden Farms Co. v. Seattle,* 2 Wn. (2d) 640, 99 P. (2d) 415; *State ex rel. Wilson v. King County,* 7 Wn. (2d) 104, 109 P. (2d) 291.

■ Where the language of a statute is plain, free from ambiguity, and devoid of uncertainty, there is no room for construction because the meaning will be discovered from the wording of the statute itself. *Shelton Hotel Co. v. Bates,* 4 Wn. (2d) 498, 104 P. (2d) 478.

■ Where an act has a doubtful or ambiguous meaning, it is the duty of the court to adopt a construction that is reasonably liberal in furtherance of the obvious or manifest purpose of the legislature. *Othus v. Kozer,* 119 Ore. 101, 248 Pac. 146; *Gallagher v. Campodonico,* 121 Cal. App. 765, 5 P. (2d) 486.

■ Statutes in *pari materia* must be construed together. Statutes in *pari materia* are those which relate to the same person or thing, or the same class of persons or things; and in construing a statute, or statutes, all acts relating to the same subject matter or having the same purpose, should be

read in connection therewith as together constituting one law. The object of the rule is to ascertain and carry into effect the intent of the legislature, and it proceeds upon the supposition that the several statutes having to do with related subject matters were governed by one spirit or policy, and were intended to be consistent and harmonious in their several parts and provisions. *State ex rel. American Piano Co. v. Superior Court*, 105 Wash. 676, 178 Pac. 827; *Paltro v. Aetna Cas. & Surety Co.*, 119 Wash. 101, 204 Pac. 1044.

■ The words and phrases used in statutes are interpreted in accordance with their common meaning, and this regardless of the policy of enacting it, or the seeming confusion that may follow its enforcement. *State v. Miller*, 72 Wash. 154, 129 Pac. 1100.

From these general rules, it follows that our attention should first be directed to the determination of whether the drugless healing act, Laws of 1919, chapter 36, p. 64 (Rem. Rev. Stat., §§ 10112-10125 [P.P.C. § 517-1 to 517-31]), gave respondent the right to practice obstetrics. It must, of necessity, be assumed that, if the statute gave an individual complying with its provisions the right to practice obstetrics, the individual had the right to follow all medical procedure and use all proper medical methods leading up to and following delivery. In our opinion, that conclusion cannot be drawn from the provisions of the statute.

Section 4 of the act of 1919, to which we have just referred, provides for the issuance of five different certificates, named as follows:

"First. A certificate authorizing the holder thereof to practice mechanotherapy;

"Second. A certificate authorizing the holder thereof to practice suggestive therapeutics;

"Third. A certificate authorizing the holder thereof to practice food science;

"Fourth. A certificate authorizing the holder thereof to practice physcultopathy;

"Fifth. A certificate for any other separate and co-ordinate system of drugless practice . . . Practitioners

hereunder shall confine their practice to the subjects and system or systems represented by their certificate or certificates granted . . . ."

Section 7 of the act provides:

"All persons granted licenses or certificates under this act [Laws of 1919, ch. 36], shall be subject to the state and municipal regulations, relating to the control of contagious diseases, the reporting and certifying of births and deaths, and all matters pertaining to public health; and all such reports shall be accepted as legal."

It is argued that the provision requiring an examination concerning obstetrics, coupled with the direction that persons receiving the benefits of the act must certify births, indicates the intention of the legislature to allow holders of certificates under the act to practice obstetrics. The provisions of the indefinitely worded statute do not indicate the extent of the practice of drugless healers.

It is necessary, then, to examine all of the pertinent acts passed in 1917 and 1919 to ascertain the powers conferred by legislative enactment.

The medicine and surgery practice act, Laws of 1919, chapter 134, p. 372 (included in Rem. Rev. Stat., §§ 10008-10024 [P.P.C. §§ 734-17 to 734-43]) passed the House February 17, 1919, the Senate, March 10, 1919, and was signed by the governor March 15, 1919. The amendment of 1947, Laws of 1947, chapter 168, p. 781 (Rem. Supp. 1947, § 10008), did not change the act in any way material to the issues here involved.

The osteopathy act, Laws of 1919, chapter 4, p. 4 (Rem. Rev. Stat., §§ 10056-10072 [P.P.C. §§ 767-1 to 767-33]), was passed by the House February 24, 1917, by the Senate March 5, 1917, vetoed by the governor March 17, 1917, and passed over his veto, January 21, 1919.

The chiropractic act, Laws of 1919, chapter 5, p. 18 (Rem. Rev. Stat., §§ 10098-10110 [P.P.C. §§ 361-1 to 361-25]), passed the House February 24, 1917, and the Senate March 5, 1917. It was vetoed by the governor March 17, 1917, and passed over his veto January 21, 1919.

The drugless healing act, Laws of 1919, chapter 36 (Rem. Rev. Stat., §§ 10112-10125), was passed by the Senate January 27, 1919, and by the House on February 11th, of that year. It was approved by the governor February 18, 1919.

The midwifery act, Laws of 1917, chapter 160, p. 717 (Rem. Rev. Stat. §§ 10174-10185 [P.P.C. §§ 735-1 to 735-23]), was passed by the Senate March 2, 1917, and by the House on March 6th, of that year. It was approved by the governor March 16, 1917.

In the following analysis of the acts, we shall refer to the 1919 chapter numbers.

Chapter 134 provides for the issuance of certificates to practice medicine and surgery within this state. To acquire that certificate, the applicant must present a diploma from a medical school approved by the Association of American Medical Colleges, together with proof that he has served as an interne in a hospital, which shall have had at least twenty-five beds for each interne, devoted to the treatment of medical, surgical, gynecological and special diseases. He must also have served for a period of six weeks in the maternity department of a hospital, during which time he shall have attended or participated in the attendance upon not less than six confinements. Aside from the above requirements, the applicant for authority to practice medicine and surgery must prove some experience in and a practical working knowledge of pathology, and the administration of anaesthetics. The examination must include the following fundamental subjects: anatomy, histology, gynecology, pathology, bacteriology, chemistry, toxicology, physiology, obstetrics, general diagnosis, hygiene, and the practice of medicine and surgery.

The act (Rem. Rev. Stat., § 10008) provides:

"Only one form of certificate shall be issued . . . Such certificate . . . shall authorize the holder thereof to practice *medicine* and *surgery* within this state. Upon compliance with the requirements of this act by an applicant for a license to practice *medicine* and *surgery* in this state, the board [director of licenses—see Rem. Rev. Stat., §§ 10854 and 10859] shall issue such certificate, authorizing

*the holder thereof to use drugs* or what are known as medicinal preparations in or upon human beings *and to sever or penetrate the tissues of human beings* and to use *any and all other methods* in the *treatment of diseases, injuries, deformities, or other physical or mental conditions.*" (Italics ours.)

Chapter 4 regulates the practice of osteopathy. The act provides for two forms of certificate: first, authorizing the holder to practice osteopathy; second, a certificate authorizing the holder thereof to practice osteopathy and surgery.

The applicant for a certificate to practice osteopathy is required to stand an examination in anatomy, histology, gynecology, pathology, bacteriology, chemistry, toxicology, physiology, obstetrics, general diagnosis, hygiene, principles and practice of osteopathy, and any other branches thereof that the board shall deem advisable.

The applicant for a certificate to practice osteopathy and surgery must take the same examination as those applying for a certificate to practice osteopathy, and in addition, must submit evidence that he has served for not less than one year as interne in a thoroughly equipped hospital, which shall have had at least twenty-five beds for each interne, devoted to the treatment of medical, surgical, gynecological and special diseases, and he also must have had a service of six weeks, or the equivalent thereof, in the maternity department of a hospital, during which time he shall have attended or participated in the attendance upon not less than six confinements. He must also take an examination in surgery and the management of surgical cases, including anaesthetics.

Chapter 5 relates to chiropractic practice. An applicant to practice chiropractic in this state must recite his history as to his educational advantages, his experience in matters pertaining to a knowledge of the care of the sick, the length of time he has studied chiropractic, under what teachers, what collateral branches, if any, he has studied, the length of time he has engaged in clinical practice, and accompany the same by reference therein, with any proof thereof in the shape of diplomas, certificates; and shall accompany

the application with satisfactory evidence of good character and reputation. The applicant is examined in the following subjects: anatomy, physiology, hygiene, symptomatology, nerve-tracing, chiropractic-orthopedy, principles of chiropractic and adjusting, as taught by chiropractic schools and colleges.

The title to chapter 36 reads:

"An Act regulating and licensing the practice of treating the sick and afflicted without the use of drugs, . . . regulating the use of certain professional terms and abbreviations, defining the term 'drugless therapeutics,' creating a drugless practitioners' fund, defining what shall be unprofessional conduct, making an appropriation from funds created by collection of license fees, prescribing penalties for the violation of this act, and repealing all acts and parts of acts in conflict herewith."

The act then provides that, in order to acquire a certificate to practice drugless therapeutics, an individual must prove a residence course of three entire sessions of thirty-six weeks each at a chartered drugless school. The applicant is compelled to pass an examination on the following subjects: anatomy, physiology, hygiene, symptomatology, urinalysis, dietetics, hydrotherapy, radiography, electrotherapy, gynecology, *obstetrics*, psychology, mechanical and manual manipulation.

Section 13 of the act (Rem. Rev. Stat., § 10123) provides:

"The term 'drugless therapeutics,' as used in this act consists of hydrotherapy, dietetics, electro-therapy, radiography, sanitation, suggestion, mechanical and manual manipulation for the stimulation of physiological and psychological action to establish a normal condition of mind and body, but shall in no way include the giving, prescribing or recommending of pharmaceutic drugs and poisons for internal use, the purpose of this act being to confine practitioners hereunder to drugless therapeutics."

Chapter 160, Laws of 1917 (Rem. Rev. Stat., §§ 10174-10182) makes provision for the issuance of certificates to any person who desires to practice midwifery. Midwifery is defined by § 8 of the act (Rem. Rev. Stat., § 10181) in the following language:

"Any person shall be regarded as practicing midwifery within the meaning of this act who shall render medical aid to a woman in childbirth for a fee or compensation or who shall advertise as a midwife by signs, printed cards or otherwise. . . . "

Applicants are required to take an examination on the following subjects: anatomy of pelvis and female genital organs; physiology of menstruation; diagnosis and management of pregnancy; diagnosis of foetal presentation and position; mechanism and management of normal labor; management of puerperium; injuries to the genital organs following labor; sepsis and anti-sepsis in relation to labor; special care of the bed and lying-in room; hygiene of mother and infant; asphyxiation, convulsions, malformation, and infectious diseases of the new-born; causes and effects of ophthalmia neonatorum; abnormal conditions requiring attention of a physician; and requirements of the vital statistics laws pertaining to the reporting of births and the rules of the state board of health relative to ophthalmia neonatorum or other infectious diseases of the new-born.

The legislature did not define any of the terms used in the acts of 1917 or 1919, except "practicing midwifery" and "drugless therapeutics." This would mean that the terms were used in their general and accepted sense in which they were commonly understood at the time of the enactment of the statutes. We find the following definitions of terms used in those statutes in Gould's Medical Dictionary (5th ed.):

"Chiropractic. A method of restoring health by palpating the spinal column for subluxations or misplaced vertebra and adjusting them by hand without other aids or adjuncts."

"Osteopathy. 2. A school of medicine based upon the theory that the body is a vital mechanical organism whose structural and functional integrity are coordinate and that the perversion of either is disease, while its therapeutic procedure is chiefly manipulative correction, its name indicating the fact that the bony framework of the body largely determines the structural relation of its tissues (Committee on Osteopathic Terminology)." (For a more complete definition, see *State v. Bonham,* 93 Wash. 489, 161 Pac. 377.)

"Obstetrics. The branch of medicine that cares for women during pregnancy, labor, and the puerperium."

"Drugless practitioner. 'Any person who practises or holds himself out in any way as practising the treatment of any ailment, disease, defect or disability of the human body by manipulation, adjustment, manual or electrotherapy or by any similar method.' "

"Drug. A substance used as a medicine."

"Anesthetic. 2. A substance that produces insensibility to touch or to pain, diminished muscular action, and other phenomena. Anesthetics may be general, local, partial, and complete."

"Practise. To perform the duties of a physician."

In *State v. Bonham, supra,* this court considered the case of an osteopath who was charged with practicing medicine and surgery at a time when he removed the tonsils from an individual. In affirming a conviction in the superior court we stated:

"The statute makes it plain, we think, that its framers regarded the practice of medicine and surgery and the practice of osteopathy as separate and distinct methods of treating the sick and afflicted, and intended to confine the practitioners of each to the particular system he professed to practice; in other words, to the system in which he had been educated."

The appellant, a sanipractor, in *State v. Lydon,* 170 Wash. 354, 16 P. (2d) 848, was convicted of practicing medicine without a license when he treated a patient for cancer of the breast. In the treatment, appellant used surgical instruments. In that case, we reviewed chapter 134, certain sections of chapter 36, and chapter 4, all of the Laws of 1919. We approved *State v. Bonham, supra,* and stated:

"A comparative study and analysis of the various acts referred to hereinabove leads to the inevitable conclusion that the legislature intended to provide, and did provide, that holders of full licenses to practice, that is, members of the regular school, so-called, should be authorized to use drugs or medicinal preparations in or upon human beings, to sever or penetrate the tissues of human beings, that is, practice surgery, and to use any and all other methods in the treatment of disease, injuries, deformities or other physical or mental conditions; further, that practitioners in all

other schools mentioned were to be restricted to their own particular methods of healing, under the respective systems taught by them, and under the certificates respectively issued to applicants therefor. It is also apparent that the drugless healers' act did not, expressly or by inference, make any provision for an examination in surgery, or for the issuance of certificates to practice surgery."

We have given the legislative history of these acts in order to point out that the legislatures of 1917 and 1919—especially that of 1919—attempted to enact laws to govern and direct all phases of treating the sick and afflicted. At the times mentioned, the legislature must have had in mind the definitions of the various schools of practice which we have set out in this opinion. In enacting the various laws, the legislature determined that practitioners in all types of healing arts, except physicians and surgeons, should be "restricted to their particular method of healing." This conclusion is fortified by our holding to which we have just referred, and by this statement in *State ex rel. Walker v. Dean,* 155 Wash. 383, 284 Pac. 756:

"It was the manifest intention of the legislature to prohibit the holders of restricted licenses from practicing branches of the art of healing not embraced within the subjects upon which the licensee had been examined, and which by his certificate he was authorized to practice."

In the acts relating to physicians and surgeons, and the act relating to osteopathy and surgery, and the act having to do with midwifery, the legislature was careful to require definite knowledge and practical experience before a certificate could issue which would entitle the holder to practice obstetrics.

The title to chapter 36, and § 13 of the act (Rem. Rev. Stat., § 10123), when liberally construed in connection with the other statutes relating to the care of the sick and afflicted, proves conclusively that the legislature intended to treat drugless healing as it did the other schools of practice—that is, that drugless healers should be allowed to do only those acts included within the definition which we have heretofore quoted.

Other reasons which reinforce the logic of the foregoing conclusions are found in the requirements for admission to, and the courses of study required by, the various schools of the healing arts. These requirements indicate the desire of the legislature to measure the extent of practice by knowledge and experience acquired by study and practice.

Medical schools accredited and approved by the Association of American Medical Colleges and the Council of Medical Education and Hospitals of the American Medical Association require that applicants for admission to schools of medicine must have a bachelor's degree and a good college record, or have completed three years of college work with a superior record, or have completed two years of college work in which they have demonstrated outstanding ability.

The premedical course requirements outlined as a basic minimum course are that, work equivalent to the following must have been satisfactorily completed by all applicants:

| Subject | Credits |
|---|---|
| English: | |
| Composition 1, 2, 3 | 9 |
| Biology: | |
| Zoology 1, 2 (General Zoology) | 10 |
| Zoology 127, 128 (Comparative Anatomy) | 10 |
| or | |
| Zoology 105 (General Vertebrate Embryology) | 5 |
| Chemistry: | |
| Chemistry 1, 2 (for students without high school chemistry) | |
| or | |
| Chemistry 21, 22 (for students who have completed a year of high school chemistry) | 10 |
| Chemistry 23 (Qualitative Analysis) | 5 |
| Chemistry 111 (Quantitative Analysis) | 5 |
| Chemistry 131, 132 (Organic Chemistry) | 10 |
| Physics: | |
| General Physics 1, 2, 3 | |
| or | |
| General Physics 4, 5, 6 | 15 |

One university credit is given for one hour of recitation a week throughout one quarter. A quarter consists of approximately eleven weeks. Elective courses which the committee on admissions of the school of medicine recommends,

include such subjects as sociology, economics, psychology, history, philosophy, modern foreign languages, mathematics, physical chemistry, cellular physiology, and genetics. The length of time required to obtain a degree of doctor of medicine is four full academic years plus an additional summer between the third and fourth years. This must be followed by one year as an interne in a recognized hospital.

An osteopath must have, before he can take the state examination for a license, a diploma issued by some chartered school of osteopathy, approved by the Association of Osteopathic Colleges. The requirements of the association for school admission are that the applicant for admission must have had a four-year high school course and a minimum of two years' collegiate work.

The following is a summary of the entrance requirements:

|  | SEMESTER HOURS |
|---|---|
| ENGLISH | 6 |
| BIOLOGY | 8 |
| PHYSICS | 8 |
| CHEMISTRY | 12 |
| ELECTIVES | 26 |
|  | 60 |

Semester hour is credit for a class that meets one hour a week for eighteen weeks.

One who receives a license to practice chiropractic must have had a high school education and completed a course of study for a period of two years of nine months each, or more, and be a graduate of a chartered chiropractic school or college. The course of study is not mentioned in the statute.

The educational requirements of a drugless healer, as we have mentioned, are a high school education and a residence course of three entire sessions of thirty-six weeks each at a chartered drugless school. It will be noted that the act does not require proof of practical experience in a hospital, nor does it indicate in any way that it was intended to extend the privilege of taking care of women prior to, at, and after childbirth. The act makes no reference to the

character of school, as do the acts relating to physicians and surgeons, and osteopathy.

What we have said about the right to practice obstetrics, applies with equal force to the administration of ether and the administration of a drug by hypodermic injection. The giving of a drug, either orally or by injection, which, as we have pointed out, is a medicine, is limited to those practitioners especially designated by statute. In this connection, it will be noted that physicians and surgeons are authorized "to use drugs" and "to sever or penetrate the tissues of human beings." The osteopathic act compels "sufficient experience in and a practical working knowledge of pathology, and the administering of anaesthetics" by one desiring a certificate to practice surgery. In addition, the osteopathic act states that "nothing in this act shall be construed to prohibit . . . the practice of midwifery . . ."

That the administering of drugs or anesthetic and the cutting of an umbilical cord are a part of a surgical operation, cannot be doubted. *International Travelers' Ass'n v. Yates*, 29 S. W. (2d) (Tex.) 980; *Order of United Commercial Travelers v. Shane*, 64 F. (2d) 55; *State v. Catellier*, 179 P. (2d) (Wyo.) 203.

It is our opinion that each count of the information charged a crime. The case will be reversed, with instructions to vacate the judgment of dismissal and to overrule the demurrer.

ROBINSON, MALLERY, and SCHWELLENBACH, JJ., concur.